1 | **ERICA K. ZUNKEL**
California State Bar No. 229285
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
4 | E-Mail: erica_zunkel@fd.org

5 | Attorneys for Ms. Ruiz-Montenegro

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE M. JAMES LORENZ)**

11 | UNITED STATES OF AMERICA,        )        Case No.        08cr1073-L
                                      )
12 |              Plaintiff,          )        DATE:        May 27, 2008
                                      )        TIME:        2:00 p.m.
13 | v.                               )
                                      )        **STATEMENT OF FACTS AND**
14 | MONIQUE RUIZ-MONTENEGRO (2),     )        **MEMORANDUM OF POINTS AND**
                                      )        **AUTHORITIES IN SUPPORT OF**
15 |              Defendant.          )        **MOTIONS**
     _____ )

16

17 | **I.**

18 | **STATEMENT OF FACTS**[1]

19 |        On February 6, 2008, at approximately 5:00 p.m., Ms. Ruiz entered the United States from Mexico

20 | through the Calexico West Port of Entry as the passenger of a 2005 Dodge Stratus driven by co-defendant

21 | Rodrigo Velasquez-Cota.  In secondary inspection, officers discovered cocaine concealed inside of the car's

22 | dashboard.  Mr. Velasquez and Ms. Ruiz were arrested and detained at the Port of Entry.

23 |        According to the Report of Investigation ("ROI") written by Special Agent Russell Vensk, Ms. Ruiz

24 | was advised of her <u>Miranda</u> rights at 9:40 p.m.  She allegedly waived them and proceeded to make statements

25 | to agents.  During the interrogation, Ms. Ruiz told agents that she accompanied Mr. Velasquez to Mexico to

26 | visit family members and eat.  Agents ridiculed what Ms. Ruiz told them about what happened on the day of

27 | her arrest as "the most ridiculous story."  Exhibit A at 14 (Translation/Transcript of Videotaped Interrogation).

28

---

[1]  Unless otherwise noted, the facts in this Statement of Facts are derived from government-produced discovery.  Ms. Ruiz does not concede the accuracy of these facts and reserves the right to contest these facts at future proceedings.

1  Agent Vensk told her: "If I was a juror, I'd be mad because I'd be insulted that you'd think that I would even

2  believe something so stupid." Id.  He told her that she was the passenger in a car that was "full of cocaine,"

3  that it was a major federal felony, and that she was going to prison.  Id.

4      Early in the interrogation, Agent Vensk asked Ms. Ruiz how she knew the driver, Mr. Velasquez.

5  She told him that he was the father of her baby, but that they were no longer together.  Id. at 3.  She indicated

6  to agents that she was afraid of doing things to upset him and therefore did not ask a lot of questions about

7  the trip to Mexico.  Id. at 13.  Later in the interrogation, when the agents were ridiculing the "ridiculousness"

8  of Ms. Ruiz's account of events, Agent Vensk brought up Ms. Ruiz's child: "You've got a kid that you just

9  got back, who you may not have back anymore.  That may be done now, you may have just screwed yourself

10 out of that.  And if you keep lying, this is what's going to happen here, we know what happened, okay.  You

11 two guy, you and him, came across the border in a car full of cocaine." Id. at 15.  Ms. Ruiz felt harassed and

12 pressured to speak to agents.  See Exhibit B, Declaration of Monique Ruiz-Montenegro.

13      Ms. Ruiz is currently charged by way of indictment with Importation of Cocaine in violation of Title

14 21 U.S.C. §§ 952 and 960 and Possession of Cocaine with Intent to Distribute in violation of Title 21 U.S.C.

15 § 841(a)(1).  The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury

16 was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See

17 Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto

18 as Exhibit C.  Judge Burns' instructions deviate from the instructions at issue in the major Ninth Circuit cases

19 challenging a form grand jury instruction previously given in this district in several ways.[2]

20      After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

21 responsibility, see Ex. C at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were forbidden "from

22 judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

23 federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id.

24 at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

25 _____

26      [2]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v.
   Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-
27 Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004) (Navarro-Vargas I);
   United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).
28

     [3]  See also id. at 20 ("You're all about probable cause.").

1  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

2  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

3  be insufficient.'" See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

4  because the grand jurors disagree with a proposed prosecution.

5       Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

6  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

7       I've gone over this with a couple of people.  You understood from the questions and
   answers that a couple of people were excused, I think three in this case, because they could
8  not adhere to the principle that I'm about to tell you.

9  Id.  That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their

10 disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

11 view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

12      In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

13 grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See id.

14 at 20.[4]

15      Now, again, this emphasizes the difference between the function of the grand jury and the
   trial jury.  You're all about probable cause.  If you think that there's evidence out there that
16 might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
   you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*
17 *duty-bound to present evidence that cuts against what they may be asking you to do if*
   *they're aware of that evidence.*

18

19 Id. (emphasis added).  The district court later returned to the notion of the prosecutors and their duties,

20 advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will

21 be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See id. at 27.

22 These motions follow.

23            **II.**

24      **MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE**

25      Ms. Ruiz moves for the production by the government of the following discovery and for the

26 preservation of evidence.  This request is not limited to those items about which the prosecutor knows, but

27 _____

28     [4]  These instructions were provided in the midst of several comments that praised the
   United States attorney's office and prosecutors in general.

08cr1073-L

1  includes all discovery listed below that is in the custody, control, care, or knowledge of any government

2  agency.  See generally Kyles v. Whitley, 514 U.S. 419 (1995); United States v. Bryan, 868 F.2d 1032

3  (9th Cir. 1989).

4        1.  The Defendant's Statements.  The government must disclose to Ms. Ruiz *all* copies of any

5  written or recorded statements made by Ms. Ruiz; the substance of any statements made by Ms. Ruiz that the

6  government intends to offer in evidence at trial; any response by Ms. Ruiz to interrogation; the substance of

7  any oral statements that the government intends to introduce at trial and any written summaries of Ms. Ruiz's

8  oral statements contained in the handwritten notes of the government agent; any response to any Miranda

9  warnings that may have been given to Ms. Ruiz; and any other statements by Ms. Ruiz.  Fed. R. Crim. P.

10  16(a)(1)(A) and (B).  The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that

11  the government must reveal *all* Ms. Ruiz's statements, whether oral or written, regardless of whether the

12  government intends to make any use of those statements.

13        2.  Arrest Reports, Notes and Dispatch Tapes.  Ms. Ruiz also specifically requests that all arrest

14  reports, notes and dispatch or any other tapes that relate to the circumstances surrounding her arrest or any

15  questioning, if such reports have not already been produced *in their entirety*, be turned over to her.  This

16  request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in

17  which statements of Ms. Ruiz or any other discoverable material is contained.  Ms. Ruiz includes in this

18  request any redacted portions of the Report of Investigation ("ROI") and any subsequent ROIs that the case

19  agent or any other agent has written.  This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and (B) and

20  Brady v. Maryland, 373 U.S. 83 (1963).  See also Loux v. United States, 389 F.2d 911 (9th Cir. 1968).  Arrest

21  reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution

22  reports pertaining to Ms. Ruiz are available under Fed. R. Crim. P. 16(a)(1)(A) and (B), Fed. R. Crim. P. 26.2

23  and 12(I).  Preservation of rough notes is requested, whether or not the government deems them discoverable.

24        3.  Brady Material.  Ms. Ruiz requests all documents, statements, agents' reports, and tangible

25  evidence favorable to him on the issue of guilt and/or that affects the credibility of the government's case.

26  Impeachment and exculpatory evidence both fall within Brady's definition of evidence favorable to the

27  accused.  United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

28  / / /

4.    <u>Any Information That May Result in a Lower Sentence</u>.  As discussed above, any information that may result in a more favorable sentence must also be disclosed pursuant to <u>Brady</u>, 373 U.S. 83.  The government must disclose any cooperation or attempted cooperation by Ms. Ruiz, as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the United States Sentencing Commission Guidelines Manual ("Guidelines").  Also included in this request is any information relevant to a Chapter Three adjustment, a determination of Ms. Ruiz's criminal history, or any other application of the Guidelines.

5.    <u>The Defendant's Prior Record</u>.  Evidence of a prior record is available under Fed. R. Crim. P. 16(a)(1)(D).  Ms. Ruiz specifically requests a complete copy of any criminal record.

6.    <u>Any Proposed 404(b) Evidence</u>.  Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . .." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Sufficient notice requires the government to "articulate *precisely* the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence."  <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions).

This includes any "TECS" records (records of prior border crossings) that the government intends to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  Although there is nothing intrinsically improper about prior border crossings, they are nonetheless subject to 404(b), as they are "other acts" evidence that the government must produce before trial.  <u>United States v. Vega</u>, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).  Ms. Ruiz requests that such notice be given *three weeks before trial* to give the defense time to adequately investigate and prepare for trial.

7.    <u>Evidence Seized</u>.  Evidence seized as a result of any search, either warrantless or with a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

8.    <u>Request for Preservation of Evidence</u>.  The defense specifically requests that all dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and that relate to the arrest or the events leading to the arrest in this case

1  be preserved.  This request includes, but is not limited to, any samples of narcotics used to run any scientific

2  tests, all narcotics, the results of any fingerprint analysis, the vehicle involved in the case, Ms. Ruiz's personal

3  effects, and any evidence seized from Ms. Ruiz or any third party.  This request also includes any material or

4  percipient witnesses who might be deported or otherwise likely to become unavailable (e.g. undocumented

5  aliens and transients).

6        It is requested that the prosecutor be ordered to *question* all the agencies and individuals involved

7  in the prosecution and investigation of this case to determine if such evidence exists, and if it does exist, to

8  inform those parties to preserve any such evidence.

9        9.    Henthorn Material.  Ms. Ruiz requests that the Assistant United States Attorney ("AUSA")

10  assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved

11  in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 437, 438 (1995) (holding that

12  "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the

13  government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir.

14  1991).  This request includes, but is not limited to, any complaints filed (by a member of the public, by

15  another agent, or any other person) against the agent, whether or not the investigating authority has taken any

16  action, as well as any matter for which a disciplinary review was undertaken, whether or not any disciplinary

17  action was ultimately recommended.  Ms. Ruiz further requests production of any such information at least

18  *one week* prior to the motion hearing and two weeks prior to trial.  If the prosecutor is uncertain whether

19  certain information should be disclosed pursuant to this request, this information should be produced to the

20  Court in advance of the motion hearing and the trial for an *in camera* inspection.

21        10.    Tangible Objects.  Ms. Ruiz requests the opportunity to inspect, copy, and test, as necessary,

22  all other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics,

23  fingerprint analyses, vehicles, or copies of portions thereof, that are material to the defense or intended for

24  use in the government's case-in-chief or were obtained from or belong to Ms. Ruiz.  Fed. R. Crim. P.

25  16(a)(1)(E).  Specifically, Ms. Ruiz requests **color copies** of all photographs in the government's possession

26  of the alleged narcotics and the vehicle in which the narcotics were found.  If the prosecutor does not wish

27  to make these copies, Ms. Ruiz requests the opportunity to do so herself.

28  / / /

11.    <u>Expert Witnesses</u>.  Ms. Ruiz requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief.  Fed. R. Crim. P. 16(a)(1)(G).  This summary should include a description of the witness' opinion(s), as well as the bases and the reasons for the opinion(s).  <u>See</u> <u>United States v. Duvall</u>, 272 F.3d 825 (7th Cir. 2001) (finding that government's written expert notice did not adequately summarize or describe police detective's testimony in drug prosecution where notice provided only a list of the general subject matters to be covered and failed to identify what opinion the expert would offer on those subjects).  This request includes, but is not limited to, disclosure of the qualifications of any government witness who will testify that he understands and/or speaks Spanish or any other foreign language that may have been used during the course of an interview with Ms. Ruiz or any other witness.

Ms. Ruiz requests the notice of expert testimony be provided at a minimum of *three weeks prior to trial* so that the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the government's expert and obtain a hearing in advance of trial to determine the admissibility of qualifications of any expert.  <u>See</u> <u>Kumho v. Carmichael Tire Co.</u>, 526 U.S. 137, 119 S. Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert testimony and such determinations may require "special briefing or other proceedings").

12.    <u>Impeachment Evidence</u>.  Ms. Ruiz requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to Ms. Ruiz.  <u>See</u> Fed. R. Evid. 608, 609 and 613.  Such evidence is discoverable under <u>Brady</u>, 373 U.S. 83.  <u>See</u> <u>United States v. Strifler</u>, 851 F.2d 1197 (9th Cir. 1988) (witness' prior record); <u>Thomas v. United States</u>, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility).

13.    <u>Evidence of Criminal Investigation of Any Government Witness</u>.  Ms. Ruiz requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.  <u>United States v. Chitty</u>, 760 F.2d 425 (2d Cir. 1985).

14.    <u>Evidence of Bias or Motive to Lie</u>.  Ms. Ruiz requests any evidence that any prospective government witness is biased or prejudiced against Ms. Ruiz, or has a motive to falsify or distort his or his testimony.  <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987); <u>Strifler</u>, 851 F.2d 1197.

08cr1073-L

15. <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity</u>. Ms. Ruiz requests any evidence, including any medical or psychiatric report or evaluation, tending to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired; and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic. <u>Strifler</u>, 851 F.2d 1197; <u>Chavis v. North Carolina</u>, 637 F.2d 213, 224 (4th Cir. 1980).

16. <u>Witness Addresses</u>. Ms. Ruiz requests the name and last known address of each prospective government witness. <u>See United States v. Napue</u>, 834 F.2d 1311 (7th Cir. 1987); <u>United States v. Tucker</u>, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective); <u>United States v. Cook</u>, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has equal right to talk to witnesses). Ms. Ruiz also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will *not* be called as a government witness. <u>United States v. Cadet</u>, 727 F.2d 1453 (9th Cir. 1984).

17. <u>Name of Witnesses Favorable to the Defendant</u>. Ms. Ruiz requests the name of any witness who made any arguably favorable statement concerning Ms. Ruiz or who could not identify him or who was unsure of his identity or participation in the crime charged. <u>Jackson v. Wainwright</u>, 390 F.2d 288 (5th Cir. 1968); <u>Chavis</u>, 637 F.2d at 223; <u>Jones v. Jago</u>, 575 F.2d 1164, 1168 (6th Cir. 1978); <u>Hudson v. Blackburn</u>, 601 F.2d 785 (5th Cir. 1979), <u>cert</u>. <u>denied</u>, 444 U.S. 1086 (1980).

18. <u>Statements Relevant to the Defense</u>. Ms. Ruiz requests disclosure of any statement that may be "relevant to any possible defense or contention" that he might assert. <u>United States v. Bailleaux</u>, 685 F.2d 1105 (9th Cir. 1982). This includes grand jury transcripts that are relevant to the defense motion to dismiss the indictment.

19. <u>Jencks Act Material</u>. Ms. Ruiz requests production in advance of the motion hearing or trial of all material, including dispatch tapes, that the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1). <u>Campbell v. United States</u>, 373 U.S. 487, 490-92 (1963); <u>see also United States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) (holding that interview notes constitutes Jencks material when an agent reviews notes with the subject of the interview); <u>see also United States v. Riley</u>, 189 F.3d 802, 806-808 (9th Cir.

1999).  Advance production will avoid the possibility of delay of the motion hearing or trial to allow Ms. Ruiz to investigate the Jencks material.  Ms. Ruiz requests pre-trial disclosure of such statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and use properly any Jencks statements during cross-examination.

20.     Giglio Information.  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Ms. Ruiz requests all statements and/or promises, expressed or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information that could arguably be used for the impeachment of any government witnesses.

21.     Agreements Between the Government and Witnesses.  Ms. Ruiz requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective government witness and the government (federal, state and/or local).  This request also includes any discussion with a potential witness about or advice concerning any immigration benefits, any contemplated prosecution, or any possible plea bargain, even if no bargain was made or the advice not followed.

22.     Informants and Cooperating Witnesses.  Ms. Ruiz requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Ms. Ruiz.  The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense.  Roviaro v. United States, 353 U.S. 52, 61-62 (1957).  The government must disclose any information derived from informants that exculpates or tends to exculpate Ms. Ruiz.

23.     Bias by Informants or Cooperating Witnesses.  Ms. Ruiz requests disclosure of any information indicating bias on the part of any informant or cooperating witness.  Giglio, 405 U.S. 150.  Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

24.     Personnel Records of Government Officers Involved in the Arrest.  Ms. Ruiz requests all citizen complaints and other related internal affairs documents involving any of the immigration officers or

1   other law enforcement officers who were involved in the investigation, arrest and interrogation of Ms. Ruiz.

2   See Pitchess v. Superior Court, 11 Cal. 3d 531, 539 (1974).  Because of the sensitive nature of these

3   documents, defense counsel will be unable to procure them from any other source.

4           25.    Training of Relevant Law Enforcement Officers.  Ms. Ruiz requests copies of all written,

5   videotaped or otherwise recorded policies or training instructions or manuals issued by all law enforcement

6   agencies involved in the case (United States Customs Service, Border Patrol, INS, Department of

7   Homeland Security, etc.) to their employees regarding:  (a) the handling of vehicles suspected to be

8   transporting contraband across the port of entry; (b) the referral to secondary inspection of persons within

9   those vehicles; (c) the detention of individuals within those vehicles; (d) the search of those vehicles and the

10   occupants of those vehicles, including the proper means of obtaining consent to search and what constitutes

11   consent to search; (e) the informing of suspects of their Constitutional rights; (f) the questioning of suspects

12   and witnesses.  Ms. Ruiz also requests all written or otherwise attainable information regarding the training

13   of Customs agents at ports of entry in California to detect or discover narcotics in vehicles entering the United

14   States, including any training offered to Border Patrol, INS, or officers of Homeland Security Department,

15   by the DEA or other law enforcement agencies or individuals.

16           26.    Performance Goals and Policy Awards.  Ms. Ruiz requests disclosure of information

17   regarding standards used for measuring, compensating or reprimanding the conduct of all law enforcement

18   officers involved in the case (Customs, Border Patrol, INS, etc.) to the extent such information relates to the

19   detection of contraband.  This request specifically includes information concerning performance goals, policy

20   awards, and the standards used by Customs for commending, demoting, or promoting agents for their

21   performance at the port of entry and their success or failure to detect illegal narcotics in general.

22           27.    Opportunity to Weigh, View and Photograph the Contraband.  Ms. Ruiz hereby requests an

23   opportunity to view, photograph, and weigh the contraband allegedly confiscated in this case.  A proposed

24   order is attached.

25           28.    DEA 7 Form.  Ms. Ruiz requests a copy of the DEA 7 form that should indicate the alleged

26   weight and purity of the contraband in this case.

27           29.    TECS Reports.  Ms. Ruiz requests all TECS reports, including reports pertaining to all

28   vehicle border crossings pertaining to the vehicle used in this case and any vehicles pertaining to Mr.

Velasquez and Ms. Ruiz. **Any prior border crossings are considered "other acts" evidence that the government must produce before trial.** <u>Vega</u>, 188 F.3d at 1154. Ms. Ruiz also requests all TECS reports related to her personal border crossings (in this car, on foot, or in another car).

30. <u>Reports of Scientific Tests or Examinations</u>. Pursuant to Fed. R. Crim. P. 16(a)(1)(F), Ms. Ruiz requests disclosure and the opportunity to inspect, copy, and photograph the results and reports of all tests, examinations, and experiments conducted upon the evidence in this case, including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and that are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

31. <u>Narcotics Detector Dog Information</u>. Ms. Ruiz moves for production of all discoverable information about any Narcotics Detector Dogs (NDDs) used in this case, including information regarding: (a) the qualifications of the NDDs and their handlers, (b) the training and experience of the NDDs and their handlers, (c) the government's procedures regarding the treatment, training and rewarding of the NDDs, (d) a detailed description of the exact method the NDDs in this case used to indicate an "alert" to contraband, and (e) the location of the NDD and the vehicle when the NDD alerted, and (f) the NDD's reliability.

32. <u>Residual Request</u>. Ms. Ruiz intends by this discovery motion to invoke her rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. This request specifically includes all subsections of Rule 16.

Ms. Ruiz requests that the government provide her and her attorney with the above requested material at least three weeks before trial.

### III.

### MOTION TO PRESERVE AND RE-WEIGH EVIDENCE

Ms. Ruiz requests that this Court issue an order for the U.S. Government and its agents to preserve the narcotic evidence in this case and to permit the defense attorney and his agents to re-weigh it without the packaging. Ms. Ruiz also requests the opportunity to view and photograph all physical evidence seized, including personal effects, items found in the car, and the car itself. For the Court's convenience, a proposed order is attached at the end of these motions.

IV.

**MOTION TO SUPPRESS STATEMENTS**

**A.    Introduction.**

The government bears the burden of demonstrating that a defendant's statement is voluntary and that Miranda warnings were given prior to a custodial interrogation.  United States v. Harrison, 34 F.3d 886, 890 (9th Cir. 1994); see also United States v. Dickerson, 530 U.S. 428, 439-41 (2000) (discussing constitutional underpinnings of Miranda v. Arizona, 384 U.S. 436, 444 (1966) and the need to safeguard "precious Fifth Amendment rights"); see also 18 U.S.C. § 3501.  Unless and until the government meets this high burden in this case, all of Ms. Ruiz's statements must be suppressed.

**B.    The Government Must Demonstrate Compliance with *Miranda* in This Case.**

**1.    *Miranda* Warnings Must Precede Custodial Interrogation.**

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of Ms. Ruiz unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 444 (1966)[5].  Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  Id.  See Orozco v. Texas, 394 U.S. 324, 327 (1969).

Once a person is in custody, Miranda warnings must be given prior to any interrogation.  See United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980).  Those warnings must advise the defendant of each of his or her "critical" rights.  United States v. Bland, 908 F.2d 471, 474 (9th Cir.1990). In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively misleading.  United States v. San Juan Cruz, 314 F.3d 384, 387 (9th Cir. 2003).  The warning must be clear and not susceptible to equivocation.  Id. (vacating illegal entry conviction where defendant was advised of his administrative rights from an I-826 form and later advised of his Miranda rights).  If a defendant indicates that he wishes to remain silent or requests counsel, the interrogation must cease.  Miranda, 384 U.S. at 474;

_____

[5]  In Dickerson v. United States, 530 U.S. 428, 120 S. Ct. 2326 (2000), the Supreme Court held that Miranda rights are no longer merely prophylactic, but are of constitutional dimension.  Id. at 2336 ("we conclude that Miranda announced a constitutional rule").

1   see also Edwards v. Arizona, 451 U.S. 484 (1981).  Unless and until the government shows that the agents

2   properly administered the Miranda warnings, the government cannot use evidence obtained as a result of any

3   custodial interrogation that occurred after Ms. Ruiz's arrest.  Miranda, 384 U.S. at 479.

4         **2.**     **The Government Must Demonstrate That Any Alleged Waiver of Ms. Ruiz's Rights Was Voluntary, Knowing, and Intelligent.**

5

6       When interrogation occurs without the presence of an attorney and a statement is taken, a heavy

7   burden rests on the government to demonstrate that the defendant intelligently and voluntarily waived her

8   privilege against self-incrimination and her right to retained or appointed counsel. Miranda, 384 U.S. at 475.

9   It is undisputed that, to be effective, a waiver of the right to remain silent and the right to counsel must be

10   made knowingly, intelligently, and voluntarily.  Schneckloth, 412 U.S. 218.  To satisfy this burden, the

11   prosecution must introduce evidence sufficient to establish "that under the 'totality of the circumstances,' the

12   defendant was aware of 'the nature of the right being abandoned and the consequences of the decision to

13   abandon it." United States v. Garibay, 143 F.3d 534, 536 (9th Cir. 1998) (quoting Moran v. Burbine, 475 U.S.

14   412, 421 (1986)).  The Ninth Circuit has stated that "[t]here is a presumption against waiver."  Garibay,

15   143 F.3d at 536.  The standard of proof for a waiver of these constitutional rights is high.  Miranda, 384 U.S.

16   at 475.  See United States v. Heldt, 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on the government is

17   great, the court must indulge every reasonable presumption against waiver of fundamental constitutional

18   rights).  Finally, it should be noted that, since Miranda rests on a constitutional foundation, see Dickerson v.

19   United States, 530 U.S. 428, 438 (2000), no law or local court rule relieves the government of its burden to

20   prove that Ms. Ruiz voluntarily waived the Miranda protections.  Miranda, 384 U.S. 475.

21       The validity of the waiver depends upon the particular facts and circumstances surrounding the case,

22   including the background, experience, and conduct of the accused.  Edwards v. Arizona, 451 U.S. 477, 472

23   (1981); Johnson v. Zerbst, 304 U.S. 458, 464 (1983).  See also United States v. Heldt, 745 F.2d at 1277;

24   United States v. McCrary, 643 F.2d 323, 328-29 (9th Cir. 1981).  In Derrick v. Peterson, 924 F.2d 813

25   (9th Cir. 1990), the Ninth Circuit confirmed that the issue of the validity of a Miranda waiver requires a two

26   prong analysis:  the waiver must be both (1) voluntary, and (2) knowing and intelligent.  Id. at 820.

27       The voluntariness prong of this analysis "is equivalent to the voluntariness inquiry under the

28   [Fifth] Amendment . . . ."  Id.  The second prong, requiring that the waiver be "knowing and intelligent,"

1   mandates an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right

2   being abandoned and the consequences of the decision to abandon it." Id. at 820-21 (quoting Colorado v.

3   Spring, 479 U.S. 564, 573 (1987)). This inquiry requires that the Court determine whether "the requisite level

4   of comprehension" existed before the purported waiver may be upheld. Id. Thus, "[o]nly if the 'totality of

5   the circumstances surrounding the interrogation' reveal *both* an uncoerced choice *and* the requisite level of

6   comprehension may a court properly conclude that the Miranda rights have been waived." Id. (quoting

7   Colorado v. Spring, 479 U.S. at 573) (emphasis in original) (citations omitted)).

8          The government bears the burden of demonstrating a meaningful Miranda waiver by a preponderance

9   of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986). Moreover, this Court must "indulge every

10  reasonable presumption against waiver of fundamental constitutional rights." Schell v. Witek, 218 F.3d 1017,

11  1024 (9th Cir. 2000) (*en banc*) (citations omitted). Unless and until the prosecution meets its burden of

12  demonstrating through evidence that adequate Miranda warnings were given and that Ms. Ruiz knowingly

13  and intelligently waived his rights, Ms. Ruiz's statements must be suppressed. Miranda, 384 U.S. at 479.

14  **C.    The Government Bears the Burden of Proving Ms. Ruiz's Statements Were Made**
        **Voluntarily.**

15

16         A defendant in a criminal case is deprived of due process of law if the conviction is founded upon

17  an involuntary confession. Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368,

18  387 (1964). This is so even when the procedural safeguards of Miranda have been satisfied. Id. The

19  government bears the burden of proving by a preponderance of the evidence that a confession is voluntary.

20  Lego v. Twomey, 404 U.S. 477, 483 (1972).

21         In order to be voluntary, a statement must be the product of a rational intellect and free will.

22  Blackburn v. Alabama, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne

23  in a particular case, the totality of the circumstances must be considered. Schneckloth, 412 U.S. at 226. Some

24  factors taken into account have included the youth of the accused, his lack of education, his low intelligence,

25  the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and

26  prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or

27  sleep. Id.

28  / / /

1    A confession is deemed involuntary whether coerced by physical intimidation or psychological

2   pressure.  Townsend v. Sain, 372 U.S. 293, 307 (1962).  "The test is whether the confession was extracted

3   by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the

4   exertion of any improper influence.'"  Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United States,

5   168 U.S. 532, 542-43 (1897)).  See also United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).  Until

6   the government meets its burden of showing all statements of Ms. Ruiz that it intends to use at trial were

7   voluntary, his statements must be suppressed as involuntary.  18 U.S.C. § 3501(a).

8   **D.**    **A Suspect Whose Statements Were Made Because of Threats – Specifically About Family – from the Interrogating Agents Has Not Voluntarily Waived her Miranda Rights, Nor Are the Statements Themselves Voluntarily Made.**

9

10    "When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in

11  a mother that she will not see her child in order to elicit 'cooperation,' they exert the 'improper influence'

12  proscribed by Malloy."  Tingle, 658 F.2d at 1336.  In Tingle, the Ninth Circuit held coercive "the warnings

13  that a lengthy prison term could be imposed, that Tingle had a lot at stake, that Tingle's cooperation would

14  be communicated to the prosecutor, that her failure to cooperate would be similarly communicated, and that

15  she might not see her two-year-old child for awhile ..."  Id. at 1336.  Thus, threats concerning one's children

16  are considered particularly coercive.  See id; see also United States v. Moreno, 891 F.2d 247, 249 (9th Cir.

17  1989).

18    Here, looking at the totality of the circumstances, Ms. Ruiz's statements and her "waiver" were

19  obtained via coercive tactics.  Agents repeatedly told Ms. Ruiz she was lying.  They used curse words.  They

20  told her that her "story" was one of the most "ridiculous" they had ever heard.  They told her she was going

21  to prison.  They told her that she was going to lose custody of her son, after having recently regained it.

22  Agents made reference to Ms. Ruiz losing her son for the purposes of overbearing her will and eliciting a

23  confession.

24  **E.**    **This Court Must Conduct An Evidentiary Hearing to Determine the Voluntariness of Ms. Ruiz's Statements.**

25

26    This Court must make a factual determination as to whether a confession was voluntarily given prior

27  to its admission into evidence.  18 U.S.C. § 3501(a).  Where a factual determination is required, courts are

28  obligated by Federal Rule of Criminal Procedure 12 to make factual findings.  See United States v. Prieto-

1  Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important as the trial

2  itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported

3  by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive

4  pleading.  Under section 3501(b), this Court must consider "all the circumstances surrounding the giving of

5  the confession," including:

6      (1) the time elapsing between arrest and arraignment of the defendant making the
       confession, if it was made after arrest and before arraignment, (2) whether such defendant
7      knew the nature of the offense with which he was charged or of which he was suspected
       at the time of making the confession, (3) whether or not such defendant was advised or
8      knew that he was not required to make any statement and that any such statement could be

9      used against him, (4) whether or not such defendant had been advised prior to questioning
       of his right to the assistance of counsel, and (5) whether or not such defendant was without
10     the assistance of counsel when questioned and when giving such confession.

11  18 U.S.C. § 3501(b) ("section 3501(b)").

12      Without the presentation of evidence, this Court cannot adequately consider these statutorily

13  mandated factors and other important factors bearing on voluntariness.  Accordingly, Ms. Ruiz requests that

14  this Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence

15  of the jury, whether any statements made by Ms. Ruiz were voluntary.

16                                              **V.**

17  ***APPRENDI V. NEW JERSEY* AND *BLAKELY V. WASHINGTON* REQUIRE
    THAT THIS COURT DISMISS THE INDICTMENT BECAUSE 21 U.S.C.**
18  **§§ 952 AND 960 ARE UNCONSTITUTIONAL**

19      Simply stated, Ms. Ruiz's Apprendi and Blakely challenge to 21 U.S.C. §§ 952 and 960 is that

20  Congress plainly intended the facts that determine the maximum sentence, drug type and quantity, to be

21  sentencing factors, not elements.  See, e.g., United States v. Sanchez, 269 F.3d 1250, 1268 (11th Cir. 2001)

22  (en banc).  Because that allocation conflicts with the requirements of the Fifth and Sixth Amendments as set

23  forth in Apprendi v. New Jersey, 530 U.S. 466 (2000) and Blakely v. Washington, 124 S. Ct. 2531 (2004),

24  the statutes are unconstitutional.  Moreover, because courts cannot disturb Congress' choice of fact-finder,

25  see United States v. Jackson, 390 U.S. 570, 576 (1968) (courts cannot "return to the [jury] the ultimate duty

26  that Congress deliberately placed in other hands"), the statute cannot be saved.

27      In United States v. Buckland, 289 F.3d 558 (9th Cir. 2002) (en banc) (holding 21 U.S.C. § 841

28  constitutional), and United States v. Mendoza-Paz, 286 F.3d 1104 (9th Cir. 2002) (holding 21 U.S.C. § 960

1  constitutional), the Ninth Circuit Court of Appeals (the "Court") rejected this constitutional challenge by

2  concluding that §§ 841 and 960 are sufficiently ambiguous to permit application of the doctrine of

3  constitutional doubt.[6] See Buckland, 289 F.3d at 564-68; Mendoza-Paz, 286 F.3d at 1109-10. However, the

4  Supreme Court's subsequent opinion in United States v. Harris, 122 S. Ct. 2406 (2002), indicates that the

5  Court's opinions in both Buckland and Mendoza-Paz were wrongly analyzed and decided. "It is already well

6  established that where a Supreme Court decision has effectively undermined prior Ninth Circuit precedent,

7  [this Court is] free to reexamine those earlier cases to determine their continuing validity." United States v.

8  Maybusher, 735 F.2d 366, 371 n. 1 (9th Cir. 1984) (9th Cir. 1984) (citation and quotation omitted).

9         To begin, the Buckland panel relied solely on its view that § 841 did not explicitly state that judges

10 were to determine drug type and quantity by a preponderance of the evidence. See Buckland, 289 F.3d at 565

11 ("[s]ection 841 is most striking for what it does not say"); accord Mendoza-Paz, 286 F.3d at 1110; but see

12 Harris, 122 S. Ct. at 2411 ("[t]he statute does not say in so many words whether brandishing is an element

13 or a sentencing factor, but the structure of the prohibition suggests it is the latter"). Accordingly, in an effort

14 to save the statutes, the Court felt free to backtrack on countless decisions holding that Congress clearly

15 intended drug type and quantity to be sentencing factors decided by a trial judge. See, e.g., United States v.

16 Lopez-Martinez, 725 F.2d 471, 475 (9th Cir. 1984) ("Under the statute, the violation is importing or

17 possessing a controlled substance. The difference between narcotic and non-narcotic controlled substances

18 is material only as to the applicable penalty") (emphasis added); accord United States v. Johnson,

19 130 F.3d 1420, 1428 (10th Cir. 1997) (affirming jury instruction that said only "controlled substance");

20 United States v. Lucien, 61 F.3d 366, 373 (5th Cir. 1995) ("The identity of the controlled substance as cocaine

21 base is not an element of the offense proscribed in the first sentence of section 844(a); nor is it an element of

22 the distribution offense denounced in section 841(a)(1)"); United States v. Williams, 876 F.2d 1521, 1251

23 (11th Cir. 1989) ("The nature and quantity of the controlled substance are relevant only to sentencing and do

24 not constitute elements of a lesser included offense").

25 / / /

26

27

28        [6] By nonetheless raising this challenge here, Ms. Ruiz asks this Court to decline to follow Ninth Circuit precedent so clearly in conflict with binding precedent of the Supreme Court. Furthermore, Ms. Ruiz specifically preserves this issue for future review.

1    The Buckland panel found support for its view that the lack of an explicit statement as to burden of

2  proof and allocation between judge and jury was "dispositive," id. at 565, in United States v. Brough,

3  243 F.3d 1078 (7th Cir. 2001), and United States v. Cernobyl, 255 F.3d 1215 (10th Cir. 2001).  The panels

4  in Brough and Cernobyl, like the Buckland panels itself, perform no statutory analysis beyond observing that

5  § 841 does not explicitly allocate the issues of type and quantity to the judge to determine by a preponderance

6  of the evidence.[7]  See Brough, 243 F.3d at 1079; Cernobyl, 255 F.3d at 1219.  Relying on these cases, the

7  Court in Buckland concluded "the emphasis on the statutory divide between 'elements' in § 841(a) and

8  'penalties' in § 841(b) is . . . unavailing."  289 F.3d at 565.

9    In Harris, the Supreme Court rejects Buckland's approach, noting, at the outset, that application of

10  traditional canons of statutory construction to determine whether Congress intended facts to be elements or

11  sentencing factors is the "threshold question."  Harris, 122 S. Ct. at 2411.  Therefore, contrary to the view

12  expressed in Buckland that "[t]he days of semantical hair splitting between 'elements [of the offense' and

13  'sentencing factors' . . . are over," Buckland, 289 F.3d at 566, the Supreme Court reaffirmed the viability of

14  the statutory construction approach that it has followed since 1998.  See Harris, 122 S. Ct. 2406; accord Carter

15  v. United States, 530 U.S. 255, 273 (2000); Castillo v. United States, 530 U.S. 120, 123 (2000); Jones v.

16  United States, 526 U.S. 227 (1999); Almendarez-Torres, 523 U.S. at 238.  The type of statutory analysis

17  undertaken in Harris, as well as in Castillo, Jones and Almendarez-Torres, makes clear that Congress intended

18  drug type and quantity to be sentencing factors.  See, e.g., United States v. Promise, 255 F.3d 150, 170-77

19  (4th Cir. 2001) (Luttig, J., concurring) (analyzing section 841 and collecting cases).  Post-Apprendi, the Court

20  has not performed that analysis, however, because of Buckland's erroneous view that its "day" had come and

21  one.  As the Court's pre-Apprendi precedent makes clear, that analysis compels concluding that Congress

22  intended drug type and quantity to be sentencing factors.[8]

23  / / /

24

---

25    [7] This approach misapplies constitutional doubt analysis, which takes place "after, and not
26  before, [a statute's] complexities are unraveled."  Almendarez-Torres v. United States, 523 U.S. 224,
   238 (1998).

27

28    [8] In fact, in Buckland the government conceded that Congress intended drug type and
   quantity to be sentencing factors and that the statute was not subject to a contrary interpretation.
   Buckland, 289 F.3d at 564; accord id. at 586 (Tashima, J., dissenting).

08cr1073-L

1   Perhaps most tellingly, <u>Harris</u> specifically rejects the notion that underlies <u>Buckland</u>, as well as

2   <u>Brough</u> and <u>Cernobyl</u>, that pre-<u>Apprendi</u> statutory interpretation cases have been "stripped" of "precedential

3   value" by "<u>Apprendi</u>'s reading of the Due Process Clause." <u>Buckland</u>, 289 F.3d at 567; <u>but see</u> <u>Sanchez</u>,

4   269 F.3d at 1268 (observing that "[f]undamentally, <u>Apprendi</u> did not announce any new principles of statutory

5   construction," and holding that "'Congress decided that the elements of a § 841 offense do not include the

6   weight of the drugs'"); <u>Buckland</u>, 289 F.3d at 586 (Tashima, J., dissenting) (same). <u>Harris</u> teaches that the

7   canon of constitutional doubt does not "embrace a dynamic view of statutory interpretation, under which the

8   text might mean one thing when enacted yet another if the prevailing view of the Constitution changed."

9   122 S. Ct. at 2413. But that is precisely what <u>Buckland</u>, <u>Brough</u> and <u>Cernobyl</u> do: each of those decisions

10  rejects, without explanation, the pre-<u>Apprendi</u> statutory interpretation of section 841. <u>See, e.g.</u>, <u>United States</u>

11  <u>v. Nordby</u>, 225 F.3d 1053, 1058 (9th Cir. 2000) ("existing precedent in this circuit plainly states that Congress

12  did not intend drug quantity to be an element of the crime under 21 U.S.C. §§ 841 and 846") (citations

13  omitted); <u>United States v. Jackson</u>, 207 F.3d 910, 920 (7th Cir.), <u>vacated</u>, 121 S. Ct. 376 (2000),

14  <u>judgment reinstated</u>, 236 F.3d 886 (7th Cir. 2001) ("[i]t is apparent that Congress intended the type and

15  quantity of the drugs distributed by a defendant convicted under section 841(a) to be determined at

16  sentencing"); <u>United States v. Jones</u>, 194 F.3d 1178, 1185-86 (1999), <u>vacated</u>, 530 U.S. 1271 (2000), <u>rev'd</u>,

17  235 F.3d 1231, 1236 (10th Cir. 2000) ("Because Congressional intent is evident from the plain language of

18  the statute, the doctrine of constitutional doubt, and in particular the constitutional doubt articulated in <u>Jones</u>,

19  [526 U.S. 227,] does not apply"); <u>see also</u> <u>United States v. Grimaldo</u>, 214 F.3d 967, 972 (8th Cir. 2000)

20  ("[t]he structure and plain language of [section 841] leave no doubt that drug quantity is a sentencing factor").[9]

21  Thus, <u>Buckland</u>, like <u>Brough</u> and <u>Cernobyl</u>, simply adopted a new "meaning" of section 841 because "the

22  prevailing view of the Constitution changed." <u>Harris</u>, 122 S. Ct. at 2413. <u>Harris</u> precludes this approach.

23  <u>Id.</u>

24      In short, the approach taken in <u>Buckland</u> and <u>Mendoza-Paz</u> has been thoroughly repudiated by <u>Harris</u>.

25  The Ninth Circuit must now assess the constitutionality of 21 U.S.C. §§ 841, 952, and 960 under <u>Apprendi</u>

26  _____

27      [9] Although the <u>Buckland</u> majority insists that it was "the judiciary, not Congress, which
    allocated the responsibility for determining drug quantity under §841 to the courts," 289 F.3d at 567,

28  <u>Jackson</u>, <u>Jones</u>, and <u>Grimaldo</u> make clear that it was Congressional intent, not judicial fiat, that
    dictated that allocation.

1  in light of the statutory construction set forth by the Supreme Court in <u>Harris</u>, <u>Carter</u>, <u>Castillo</u>, <u>Jones</u> and

2  <u>Almendarez-Torrez</u>. As the Court's pre-<u>Apprendi</u> cases show, an honest assessment reveals that these statutes

3  are facially unconstitutional.

4                                                        **VI.**

5        **IF THIS COURT UPHOLDS THE CONSTITUTIONALITY OF THE STATUTE,**
         **THE INDICTMENT MUST NEVERTHELESS BE DISMISSED BECAUSE THE**
6        **GRAND JURY WAS NOT ASKED TO FIND THAT MS. RUIZ *KNEW* THE**
         **TYPE AND QUANTITY OF NARCOTIC THAT WAS INVOLVED IN THIS OFFENSE**
7

8         If this Court reinterprets the type and quantity of controlled substance to be offense elements or the

9  "functional equivalent" of offense elements that have to be alleged in the indictment, this Court must find that

10 the statute's *mens rea* is equally applicable to these new "elements."  <u>See</u> <u>United States v. X-Citement Video,</u>

11 <u>Inc.</u>, 513 U.S. 64 (1994); <u>but see</u> <u>United States v. Carranza</u>, 289 F.3d 634 (9th Cir. 2002).  Not only must the

12 indictment allege the type and quantity of "controlled substance" involved in the offense, the indictment must

13 allege that the defendant knew the type and quantity involved.  And, regardless of what this Court considers

14 the elements of his alleged offense, Mr.  has a right to a Grand Jury determination on each one.  <u>See</u>

15 <u>United States v. Du Bo</u>, 186 F.3d 1177, 1179 (9th Cir. 1999) ("The Fifth Amendment . . . requires that a

16 defendant be convicted only on charges considered and found by a grand jury."); <u>see also</u> <u>id.</u> (reversing

17 because the Ninth Circuit could "only guess whether the grand jury received evidence of, and actually passed

18 on, Du Bo's intent.") (emphasis added).  Thus, assuming that this Court upholds the constitutionality of

19 section 841, the grand jury should have found that Ms. Ruiz knew that approximately 50.62 kilograms of

20 marijuana were involved in this offense.  Because the grand jury made no such finding, this Court should

21 dismiss the indictment.

22                                                       **VII.**

23       **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S**
         **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**
24       **AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
         **AMENDMENT BY DEPRIVING MS. RUIZ OF THE TRADITIONAL FUNCTIONING OF THE**
25                                                    **GRAND JURY**

26 **A.**     **Introduction.**

27        The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was

28 instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  <u>See</u>

1  Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto

2  as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue

3  in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

4  several ways.[10]  These instructions compounded Judge Burns's erroneous instructions and comments to

5  prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

6  at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto

7  as Exhibit B.[11]

8        **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to
            Determine Whether or Not Probable Cause Exists and That They Have No
9           Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

10        After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

11  responsibility, see Ex. B at 3, 3-4, 5,[12] Judge Burns instructed the grand jurors that they were forbidden "from

12  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

13  federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

14  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

15  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

16  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

17  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

18  because the grand jurors disagree with a proposed prosecution.

19        Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

20  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

21  / / /

22  _____

23     [10]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v.
    Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-
24  Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United
    States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).
25

26     [11]  The transcript of the voir dire indicates that grand jurors were shown a video presentation
    on the role of the grand jury.  Mr. De Leon requests that the video presentation be produced.  See
27  United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand
    jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").
28

     [12]  See also id. at 20 ("You're all about probable cause.").

1  I've gone over this with a couple of people. You understood from the questions and
   answers that a couple of people were excused, I think three in this case, because they could
2  not adhere to the principle that I'm about to tell you.

3  Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

4  disagreement with Congress. See id. at 8-9. Thus, Judge Burns not only instructed the grand jurors on his

5  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

6          Examination of the recently disclosed voir dire transcript, which contains additional instructions and

7  commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

8  reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists

9  and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress

10 merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his

11 earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause

12 determination.

13  [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
    crime was committed? And second, do we have a reasonable belief that the person that
14  they propose that we indict committed the crime?"
    If the answer is "yes" to both of those, then the case should move forward. If the answer
15  to either of the questions is "no," then the grand jury should not hesitate and not indict.

16 See Ex. C at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

17 term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

18 addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

19 committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

20 crime."

21         Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

22 in some unknown set of circumstances, they might decline to indict even where there was probable cause.

23 Because of the redactions of the grand jurors' names, Mr. De Leon will refer to them by occupation. One is

24 a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The

25 CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

26 an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration

27 cases. See id.

28 / / /

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See id. Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

1  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

2  on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

3      In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

4  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

5  juror is obligated to vote to indict if there is probable cause.

6      I can tell you sometimes I don't agree with some of the legal decisions that are indicated
       that I have to make.  But my alternative is to vote for someone different, vote for someone
7      that supports the policies I support and get the law changed.  It's not for me to say, "well,
       I don't like it.  So I'm not going to follow it here."

8
9      You'd have a similar obligation as a grand juror even though you might have to grit your
       teeth on some cases.  Philosophically, if you were a member of congress, you'd vote
       against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote
10     against criminalizing some drugs.

11     That's not what your prerogative is here.  You're prerogative instead is to act like a judge
       and say, "all right.  This is what I've to  deal with objectively.  Does it seem to me that a
12     crime was committed?  Yes.  Does it seem to me that this person's involved?  It does." *And
       then your obligation, if you find those to be true, would be to vote in favor of the case going*
13     *forward.*

14  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if both

15  questions are answered in the affirmative, lead to an "obligation" to indict.

16      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

17  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

18  to indict in every case in which there was probable cause.

19     The Court: Do you think you'd be inclined to let people go in drug cases even though you
       were convinced there was probable cause they committed a drug offense?
20     REA: It would depend on the case.
       The Court: Is there a chance that you would do that?
21     REA: Yes.
       The Court: I appreciate your answers.  I'll excuse you at this time.

22

23  Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

24  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

25  should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

26  indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge Burns

27  made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to

28  hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

1  because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[13]

2  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great

3  a risk to run.

4      **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

6      In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

7  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex.

8  B at 20.[14]

---

[13] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence.  See Ex. B at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[14] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. B at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. C at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys.  See Ex. B at 9-10.  Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. C at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors."  Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice,"

1  Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're
2  all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they*
3  *may be asking you to do if they're aware of that evidence.*

4  Id. (emphasis added).

5         The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that

6  "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. C at 14, Judge Burns

7  gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.  If there's something

8  adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."  See id.  Thus,

9  Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

10  "adverse" or "that cuts against the charge."  See id.

11  **B.    *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole**
12  **During Impanelment.**

13         The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

14  grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth

15  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

16  approach[15] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

17  the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand

18  jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January

19  2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

20  bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

21  exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

22  States v. Williams, 504 U.S. 36, 49 (1992).

23

24  see Ex. B at 12, does not cure the error as courts regularly presume grand jurors follow instructions
25  provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they
26  understood the instruction as given and then followed it.").

27  [15]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
28  majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

08cr1073-L

1    For instance, with respect to the grand jury's relationship with the prosecution, the <u>Navarro-Vargas</u>

2 <u>II</u> majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

3 deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

4 as a grand jury.'"  <u>Navarro-Vargas II</u>, 408 F.3d at 1200 (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 510

5 (1978).  <u>Accord</u> <u>United States v. Navarro-Vargas</u>, 367 F.3d 896, 900 (9th Cir. 2004) (<u>Navarro-Vargas</u>

6 <u>I</u>)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

7 prosecutorial." ).  <u>See also</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

8 the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, <u>id.</u>, but

9 also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

10 prosecutor."  <u>Id.</u>  <u>See</u> Niki Kuckes, <u>The Democratic Prosecutor:  Explaining the Constitutional Function of</u>

11 <u>the Federal Grand Jury</u>, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

12 "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

13 that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., <u>Criminal Procedure</u>

14 § 15.2(g) (2d ed. 1999)).

15    Indeed, the <u>Navarro-Vargas II</u> majority agrees that the grand jury possesses all the attributes set forth

16 in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986).  <u>See</u> <u>id.</u>

17    The grand jury thus determines not only whether probable cause exists, but also whether
     to "charge a greater offense or a lesser offense; numerous counts or a single count; and

18    perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis
     of the same facts.  And, significantly, the grand jury may refuse to return an indictment

19    even "'where a conviction can be obtained.'"

20 <u>Id.</u> (quoting <u>Vasquez</u>, 474 U.S. at 263).  The Supreme Court has itself reaffirmed <u>Vasquez</u>'s description of

21 the grand jury's attributes in <u>Campbell v. Louisiana</u>, 523 U.S. 392 (1998), noting that the grand jury "controls

22 not only the initial decision to indict, but also significant questions such as how many counts to charge and

23 whether to charge a greater or lesser offense, including the important decision whether to charge a capital

24 crime."  <u>Id.</u> at 399 (citing <u>Vasquez</u>, 474 U.S. at 263).  Judge Hawkins notes that the <u>Navarro-Vargas II</u>

25 majority accepts the major premise of <u>Vasquez</u>: "the majority agrees that a grand jury has the power to refuse

26 to indict someone even when the prosecutor has established probable cause that this individual has committed

27 a crime."  <u>See</u> <u>id.</u> at 1214 (Hawkins, J. dissenting).  <u>Accord</u> <u>Navarro-Vargas I</u>, 367 F.3d at 899 (Kozinski, J.,

28 dissenting); <u>United States v. Marcucci</u>, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

1    dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

2    But not in Judge Burns's instructions.

3    **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

4

5          The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand

6    jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

7    in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon every

8    finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at

9    1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably

10   pointed out.  See <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of

11   the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors,

12   and thus to circumscribe the grand jury's constitutional independence.").  See also <u>id.</u> ("The 'word' should is

13   used to express a duty [or] obligation.") (quoting <u>The Oxford American Diction and Language Guide</u> 1579

14   (1999) (brackets in original)).

15         The debate about what the word "should" means is irrelevant here; the instructions here make no

16   such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

17   choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

18   disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

19   indicting even though I think that the evidence is sufficient'...." See Ex. C at 8-9.  Thus, the instruction flatly

20   bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

21   would read this language as instructing, or even allowing, him or her to assess "the need to indict." <u>Vasquez</u>,

22   474 U.S. at 264.

23         While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

24   an indictment was required if probable cause existed, <u>see</u> Ex. C at 4, 8, n context, it is clear that he could only

25   mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

26   only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

27   probable cause, "then the grand jury should hesitate and not indict." <u>See id.</u> at 8.  At least in context, it would

28   strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

1  jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly he was

2  not.

3        The full passage cited above effectively eliminates any possibility that Judge Burns intended the

4  Navarro-Vargas spin on the word "should."

5        [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
       crime was committed?  And second, do we have a reasonable belief that the person that
6      they propose that we indict committed the crime?"

7        If the answer is "yes" to both of those, then the case should move forward.  If the answer
       to either of the questions is "no," then the grand jury should not hesitate and not indict.

8  See Ex. C at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that

9  if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

10 room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205

11 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the

12 innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities

13 continue to include both the determination whether there is probable cause and the protection of citizens

14 against unfounded criminal prosecutions.") (citation omitted).

15        By the same token, if Judge Burns said that "the case should move forward" if there is probable

16 cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

17 Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

18 two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

19 been his intent.  But even if it were, no grand jury could ever have had that understanding.[16]  Jurors are not

20 presumed to be capable of sorting through internally contradictory instructions.  See generally United States

21 v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

22 presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

23        Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

24 clear to the grand jurors that "should" was not merely suggestive, but obligatory:

25 / / /

26 _____

27        [16]  This argument does not turn on Mr. Gonzalez's view that the Navarro-Vargas/Marcucci
   reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the
28 context in which the word is employed by Judge Burns in his unique instructions, context which
   eliminates the Navarro-Vargas/Marcucci reading as a possibility.

**(1)**    The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. C at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

**(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

> Court    . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and

/ / /

1    contrary to the situation in <u>Navarro-Vargas</u>, "should" means "shall"; it is obligatory, and the juror has no

2    prerogative to do anything other than indict if there is probable cause.

3        Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

4    a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

5    rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

6    indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

7    prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

8    scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the

9    prospective jurors, because his message is that there is no discretion not to indict.

10   **(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point home that

11   "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that

12   you follow the law that's given to us by the United States Congress.  We enforce the federal laws here."  <u>See</u>

13   <u>id.</u> at 61.

14   **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in every case

15   where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them

16   that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence

17   is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to

18   be and try to impose that through applying it in a grand jury setting."  <u>See</u> Ex. B at 9.

19       Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

20   penalties to which indicted persons may be subject.

21       Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case
         is about because there is a disparity between state and federal law.
22       The Court:  In what regard?
         Prospective Juror: Specifically, medical marijuana.
23       The Court:  Well, those things -- the consequences of your determination shouldn't concern
         you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of*
24       *course, that they cannot consider the punishment or the consequence that Congress has set*
         *for these things.  We'd ask you to also abide by that.*  We want you to make a business-like
25       decision of whether there was a probable cause. ...

26   <u>See</u> Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

27   would obviously leave no role for the consideration of penalty information.

28   / / /

1     The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

2  penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See

3  United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two

4  reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context,

5  as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

6  ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized

7  consideration of penalty information. See 474 U.S. at 263.

8     Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

9  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

10  was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct

11  contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand

12  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

13  Vasquez:

14         The grand jury does not determine only that probable cause exists to believe that a
           defendant committed a crime, or that it does not. In the hands of the grand jury lies the
15         power to charge a greater offense or a lesser offense; numerous counts or a single count;
           and perhaps most significant of all, a capital offense or a non-capital offense – all on the
16         basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case
           where a conviction can be obtained."

17

18  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

19  dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

20  initial decision to indict, but also significant decisions such as how many counts to charge and whether to

21  charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor

22  would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See

23  id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent

24  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

25  jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must

26  therefore be dismissed. Id.

27     The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

28  instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

1 independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."

2 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may have on a grand

3 jury because "it is the *structure* of the grand jury process and its *function* that make it independent."  Id. at

4 1202 (emphases in the original).

5      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

6 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

7 of many of its decisions -- sufficiently protects that power."  See id. at 1214 (Hawkins, J., dissenting).  The

8 flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

9 making a probable cause determination ... unconstitutionally undermines the very structural protections that

10 the majority believes save[] the instruction."  Id.  After all, it is an "'almost invariable assumption of the law

11 that jurors follow their instructions.'"  Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

12 "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

13 in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

14 instructions because nothing will happen if they disobey them."  Id.

15      In setting forth Judge Hawkins' views, Ms. Ruiz understands that this Court may not adopt them

16 solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

17 Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.  Here, again,

18 the question is not an obscure interpretation of the word "should", especially in light of the instructions and

19 commentary by Judge Burns during voir dire discussed above - unaccounted for by the Court in Navarro-

20 Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse

21 to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-

22 Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

23      Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

24 they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

25 prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  See Ex.

26 B at 8; Ex. C at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden

27 grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience

28 of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

1  exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches of government

2  by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d 1061, 1066 &

3  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own

4  initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and, here, Judge

5  Burns has both fashioned his own rules and enforced them.

6  **D.     The Instructions Conflict with Williams' Holding That There Is No Duty to Present**
   **Exculpatory Evidence to the Grand Jury.**

7

8         In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

9  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

10  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

11  common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

12  judicial authority exists." <u>See</u> <u>id.</u> at 47.  Indeed, although the supervisory power may provide the authority

13  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

14  amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

15  Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does

16  not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u> at 47

17  (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own initiative,

18  rules of grand jury procedure." <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's claim, both

19  as an exercise of supervisory power and as Fifth Amendment common law. <u>See</u> <u>id.</u> at 51-55.

20         Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

21  present to them evidence that tended to undercut probable cause. <u>See</u> Ex. B at 20.

22         Now, again, this emphasizes the difference between the function of the grand jury and the
   trial jury.  You're all about probable cause.  If you think that there's evidence out there that
23         might cause you say "well, I don't think probable cause exists," then it's incumbent upon
   you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*
24         *duty-bound to present evidence that cuts against what they may be asking you to do if*
   *they're aware of that evidence.*

25

26  <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

27  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

28  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u>

1  id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  See

2  Navarro-Vargas, 408 F.3d at 1207.

3       This particular instruction has a devastating effect on the grand jury's protective powers, particularly

4  if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

5  conveyed by the previous instruction: "You're all about probable cause."  See Ex. B at 20.  Thus, once again,

6  the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

7  probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

8  would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

9  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

10  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

11  cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

12  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

13  you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns informed the

14  jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that

15  cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See Ex. C at 14-15

16  (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by the

17  "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from

18  of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  See

19  Ex. B at 27.

20       These instructions create a presumption that, in cases where the prosecutor does not present

21  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

22  exculpatory evidence was presented, would proceed along these lines:

23      (1)    I have to consider evidence that undercuts probable cause.

24      (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

25             evidence to me, if it existed.

26  / / /

27  / / /

28  / / /

(3)    Because no such evidence was presented to me, I may conclude that there is none. Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## VIII.

## MOTION FOR LEAVE TO FILE FURTHER MOTIONS

Defense counsel for Ms. Ruiz has received only 96 pages of discovery.  She believes that discovery is not yet complete.  Furthermore, defense counsel has not yet had an opportunity to examine and re-weigh the drugs at issue in this case or to view the vehicle seized and Ms. Ruiz's personal effects.  Ms. Ruiz respectfully requests leave to file further motions based on information obtained through the discovery process.

## IX.

## CONCLUSION

For the foregoing reasons, Ms. Ruiz respectfully requests that the Court grant the above motions.

Respectfully submitted,


DATED:       May 12, 2008                          /s/ Erica K. Zunkel
                                                   **ERICA K. ZUNKEL**
                                                   Federal Defenders of San Diego, Inc.
                                                   Attorneys for Ms. Ruiz