## <u>UNITED STATES v. MONIQUE RUIZ-MONTENEGRO</u>
### U.S.D.C. Case No. 08CR1073-L-02

### INDEX OF EXHIBITS

Transcription of Interrogation (Exhibit A).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 2
Declaration (Exhibit B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Page 24
Reporter's Transcript of Proceedings Dated January 11, 2007 (Exhibit C). . . . . . . . . . . . . .  Page 28

# EXHIBIT A

AGENT 1:     February 2, 2008, 21:38, Russ Spence (sp?), Tom Banks (sp?), interviewing Monique, what's her name, Velasquez?

AGENT 2:     Monique Montenegro.

AGENT 1:     Oh, Monique Montenegro.  Wait, hang on a second, though, Tom.  We're good.

AGENT 2:     Alright.

***[LONG PAUSE]***

AGENT 1:     Okay, have a seat right there.  ***.

CLIENT:     Oh, okay.

AGENT 1:     I'm, uh, Special Agent Spence (sp?) of Immigration & Customs Enforcement.

AGENT 2:     ***.

AGENT 1:     ***, we're going to ask you some questions about what's going on here today, and why you're here, but before we do that, I need to read you your rights, okay?  Mmm, pull up the chair closer.  I'm going to read you your rights.  After I read it, we need you to state out loud "yes," if you understand it, or "no" if you don't.  And I need you to put your initials here, okay?  And, just for the record, you do speak English?  You can read and write English?  Okay, cool.  Thanks.  Before we ask you any questions, it is my duty to advise you of your rights.  Do you understand that?

CLIENT:     Yeah.

AGENT 1:     Okay.  You have the right to remain silent.  Do you understand that?

CLIENT:     Yeah.

AGENT 1:     Anything you say can be used against you in court or other proceedings.  Do you understand that?

CLIENT:     Mm-hmm.

AGENT 1:     You have the right to consult an attorney before making any statement or answering any questions.  Do you understand that?

CLIENT:     Yes.

1

AGENT 1:    You, you have the right to have an attorney present with you during questioning.  Do you understand that?

CLIENT:    Yeah.

AGENT 1:    Yeah, okay.  If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.  Do you understand that?  And, if you decide to answer questions now, you will still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.  Do you understand that?  You said "yes" ***?

CLIENT:    Yeah.

AGENT 1:    This is your chance to talk to us, if you want to tell us what's going on.  Um, it's up to you, okay.  You don't have to.  You understand that, right?  Okay, do you want to tell us what's going on?  Do you want to answer?

CLIENT:    Well, I really don't know nothing.  Mm, I just, I was with my . . .

AGENT 1:    I, I, I just want to know, I mean, do you want to talk without a lawyer, or not?  I need . . .

CLIENT:    I just went to go visit . . .

AGENT 1:    Yeah, well, I know, I know, I don't want, I can't have a story until you just for the record you say, "yeah, I want to talk."

CLIENT:    Yeah, I want to talk.

AGENT 1:    You sure?  Okay, then I need you to read this paragraph out loud.  It's a waiver of rights.  If you could just read that out loud, please.

CLIENT:    Mention all of this?

AGENT 1:    Yeah.

CLIENT:    I have, I had the *** statement of rights read and explained to me and I am fully understanding the rights.  I waive them freely and voluntarily without threat or intimidation, without any promises of reward or *** . . .

AGENT 1:    Immunity.

2

CLIENT:      Immunity.  I was taken into custody at 17:12 hours time until 6/8.  They have signed the document at 2 . . .

AGENT 1:     21:40.

CLIENT:      21:40 hours time on 02/06/08.

AGENT 1:     Okay, do you under, understand what this means?  Okay, alright, yeah, if you answer questions, we're not promising you anything and we're not forcing you.  Okay, I need you to print your name here and sign here.

AGENT 2:     *** if you talk to us, I'm going to ask you to tell the truth, alright.  Don't start taking us down different paths, don't start lying to us, because we're going to find that out.  Okay, if you start lying, it's not going to add up, and we're going to find that out.  Okay, we've already talked to your mom.  Okay, she even asked us to tell you to tell the truth.  Okay, you know why you're here.  Do you know why you're here?

CLIENT:      Because they found drugs, I guess, inside the car.

AGENT 1:     Okay, they told you that, right?

CLIENT:      Mm-hmm.

AGENT 1:     Right now, you are under arrest for, um, importation of cocaine, okay.  The car you were in, there was cocaine found in it, alright.  And, you know that.

CLIENT:      I know that cause they told me.

AGENT 1:     Okay, well, no, that's what you're saying, but, I mean, you knew something before that.  Mm-hmm.  Who is Rodrigo to you?

CLIENT:      Um, he's my baby's dad.

AGENT 1:     He's your . . .

CLIENT:      My baby's dad.  I have a kid from him.

AGENT 1:     You know what I didn't ask you, do you, do you do any drugs?

CLIENT:      No.

AGENT 1:     You don't?

CLIENT:       No.

AGENT 1:      You drink at all?  Alcohol?

CLIENT:       No.

AGENT 1:      Did you need any water at all?

CLIENT:       Did I drink any water?

AGENT 1:      Do you want any water?

CLIENT:       No.

AGENT 1:      Do you need to use the restroom at all?

CLIENT:       No.

AGENT 1:      Okay.  And, did you graduate high school?

CLIENT:       Um, no, I dropped out in the ninth grade.

AGENT 1:      Mm, okay, so you completed, did you complete ninth?

CLIENT:       Eighth.

AGENT 1:      So, Rodrigo is . . .

CLIENT:       My baby's dad.

AGENT 1:      So, he's not your boyfriend?

CLIENT:       No.

AGENT 1:      Okay, you're not married?

CLIENT:       No.

AGENT 1:      Okay, do you live with him?

CLIENT:       Um, no, he stays with me.

AGENT 1:      He stays with you?

4

CLIENT:        Yeah.

AGENT 1:       Does he live there?

CLIENT:        Um, well, not really.  He just goes and stays whenever he wants, so I don't know if it's living there, or . . .

AGENT 1:       Do you know where else he goes?

CLIENT:        Um, his mom's.

AGENT 1:       Do you know that or do you, do you just think he stays there?

CLIENT:        Well, most likely his mom's cause, um, he tells me, he going to . . .

AGENT 1:       That's, that's what he tells you?

### ***[PAUSE]***

AGENT 1:       Can, can you tell us what you were doing today?

CLIENT:        Mm, well, we came to Mex and we went to go eat at the Marisco's.  He took me out to go eat at Mari-, the Marisco's, the seafood place, and we ate right there, and then we get in the car . . .

AGENT 1:       Okay, um, what, what time was that?

CLIENT:        Mm, this was, uh, what time was it when you ***?  It was maybe around two, three, I don't know.  But before we got in the car, he was talking to, I guess, one of his friends right there.

AGENT 1:       Right where?

CLIENT:        At the Marisco's place.

AGENT 1:       Okay, did he, did you, where did you guys leave from?

CLIENT:        Um, well, we were visiting relatives.

AGENT 1:       Where?

CLIENT:        Baminos (sp?), in Mex.

AGENT 1:     What time did you go to Mexico?

CLIENT:      Um, it was around 12, 1, 1 or 2.

AGENT 1:     And where did you leave from?

CLIENT:      Um, we left from my house.

AGENT 1:     Your house?

CLIENT:      Yeah.

AGENT 1:     In El Centro?  About 12 o'clock?

CLIENT:      Yeah, right around then.

AGENT 1:     What, what car were you in?

CLIENT:      Um, I think it's gray, the gray car.

AGENT 1:     The car that you came back in?

CLIENT:      Yeah.

AGENT 1:     Do you know who's car it is?

CLIENT:      Um, my baby's dad, Rodrigo's.

AGENT 1:     Do you know how long he's had it?

CLIENT:      Probably three months or so.

AGENT 1:     Did you, had you seen him earlier in the day or did he just come by at 12 o'clock?

CLIENT:      Uh, just came by and picked me up.

AGENT 1:     And picked you up at 12 o'clock.  And from there you went down to Mexicali?

CLIENT:      Yeah, to Mexicali to go eat.

AGENT 1:     Okay, and you, did you go visit relatives first?

6

CLIENT:         First, well, yeah, first we went to go visit the relatives, his relatives, and, um, from there we left and that's when we went to go eat at the restaurant.

AGENT 1:        Okay, do you know his relatives names and all, where they live . . .

CLIENT:         No, I just barely met them.  No.

AGENT 1:        And then you went to eat at about?

CLIENT:         I'd say like around like, it was kind of late, so, three or four, I think.

AGENT 1:        Okay, when you, you went to the relatives house, was the car there?

CLIENT:         Um, yeah, the car was there.

AGENT 1:        Okay.

CLIENT:         Then the car wasn't there when we went to go eat.

AGENT 1:        It was . . .

CLIENT:         It wasn't there when we went to go eat.

AGENT 1:        It wasn't there when you went to go eat?

CLIENT:         No, cause he was talking to his friend.

AGENT 1:        So, you went to the relatives house, you parked the car, there, on the street?

CLIENT:         Yeah, like around the corner, from the seafood place.  Okay, after we came from the relatives, after we went to the relatives . . .

AGENT 1:        We're at the relatives house.

CLIENT:         Okay.

AGENT 1:        That's where we're at right now.

CLIENT:         Oh, well, from there, we left to go eat.

AGENT 1:        Okay, you went to the relatives house in the car, and the car was there?

CLIENT:         Yeah, the car was there.

AGENT 1:     Parked on the street, by the house?

CLIENT:      Parked right there by the house.

AGENT 1:     Okay, then you left there?

CLIENT:      Then we left and that's when we went to go find a restaurant to go eat at.

AGENT 1:     Okay, do you know where the restaurant was?

CLIENT:      Uh, Marisco's, it's, *** I don't know my way around Mex.

AGENT 1:     Uh, uh, that's fine.  And when you got there, he was talking to a friend you said?

CLIENT:      Yeah, he was talking to a friend.

AGENT 1:     Do you have the friend's name?

CLIENT:      No, I never met him.

AGENT 1:     No?  Do you know what he looks like?

CLIENT:      He was kind of tall and skinny.  I don't remember if he had hair because he had a hat.

AGENT 1:     What kind of hat?

CLIENT:      Um, probably, like a blue.

AGENT 1:     Like a baseball cap?

CLIENT:      Like a baseball cap.

AGENT 1:     How long did he talk to him for?

CLIENT:      For like an hour.

AGENT 1:     About an hour.  Before you went to eat, before you guys ate?

CLIENT:      Mm-hmm.

AGENT 1:     So, you guys were, you left El Centro about 12 o'clock?

CLIENT:      Mm-hmm.

AGENT 1:      Okay, went to the relatives' house.

CLIENT:       Relatives.

AGENT 1:      Stayed there.  How long were you there?

CLIENT:       For like only a couple of hours.

AGENT 1:      Mm, then you left there and went to the seafood place.

CLIENT:       Then we went to go eat.

AGENT 1:      And you're saying they talked for about an hour before you went to eat?

CLIENT:       And I was in the restaurant waiting and he was outside talking.

AGENT 1:      Okay, so you were actually inside?

CLIENT:       Yeah.

AGENT 1:      Okay, you didn't hear anything they talked about?

CLIENT:       No.

AGENT 1:      Okay.  And, after they talked, he, he came, Rodrigo came inside to eat?

CLIENT:       Mm-hmm.

AGENT 1:      Okay.  What did you guys eat?

CLIENT:       Uh, we, um, some shrimp, *** shrimp.

AGENT 1:      Mmm.  I love shrimp.  I had shrimp tonight for dinner, too.

AGENT 2:      Grilled cheese.

AGENT 1:      Uh-huh, I had grilled shrimp salad at Applebee's.  Um, and while you guys were
              eating, where was the car?

CLIENT:       Um, the car wasn't there because, um, we went for a walk.

AGENT 1:      You went for a walk?

9

**10**

CLIENT:        Yeah.

AGENT 1:       What, after you ate?

CLIENT:        After we ate.

AGENT 1:       Where did you go for a walk?

CLIENT:        Around the corner.

AGENT 1:       What was around the corner?

CLIENT:        Around the corner where the seafood place was at.

AGENT 1:       Okay.  And the car wasn't there at that time?

CLIENT:        No, because I didn't see it, because he told me, "let's go for a walk."

AGENT 1:       Okay.

CLIENT:        I didn't ask questions, I just went.

AGENT 1:       Mm-hmm.  And when did, when did the car reappear?

CLIENT:        When he got a phone call on the phone.

AGENT 1:       Do you know which phone he got the phone call on.  He had two cell phones that we know of.

CLIENT:        The long one, I think.

AGENT 1:       The long one.  So he got a call on his cell phone and then what happened?

CLIENT:        And then we, um, after we came back from the walk, we got in the car and then we took off.

AGENT 1:       So the car was just there?

CLIENT:        Yeah.  Well, the car wasn't there when we came out and then when we came back from the walk it was there.

AGENT 1:       You went for a walk just around the corner?

10

**11**

CLIENT:        Yeah, around the corner.

AGENT 1:       And he got a call?

CLIENT:        And he got a call, and then that's when we got in the car.

AGENT 1:       What was he saying on the phone?

CLIENT:        Um, honestly, I don't listen to his conversations.

AGENT 1:       Okay, but you didn't hear anything?  Not a word?  Did you pick up anything?

CLIENT:        Just, all I heard was, "okay, can you go hang? ***," and then that's all.

AGENT 1:       Okay, so you're, you're around the corner from the restaurant and you went back where?  Back?

CLIENT:        Okay, after we came back from the walk, on the ***, from the seafood place . . .

AGENT 1:       Mm-hmm.

CLIENT:        We got in the car when he got the phone call.

AGENT 1:       Uh, how long was the walk?

CLIENT:        Mm, not that long, just around the block.

AGENT 1:       Okay, so he got the call and then where was the car when you got back into it?

CLIENT:        Mm, it was parked, um, down the street.

AGENT 1:       From the restaurant?

CLIENT:        Across the street from the restaurant.

AGENT 1:       Did, did you see who dropped it off?

CLIENT:        Huh?

AGENT 1:       Did you see who . . .

CLIENT:        No.

11

AGENT 1:    Then did you see who took the car from the restaurant?

CLIENT:    No.

AGENT 1:    Did you have any ideas, concerns, questions about what was going on with the car? I mean, you drove there in it, it wasn't there, somehow it just magically disappeared and all of a sudden it was there again.

CLIENT:    Honestly, I didn't ask any questions cause, um, . . .

AGENT 1:    Did you have any thoughts about . . .

CLIENT:    Mm, I didn't know he was going to do this.  I mean, I didn't know, I mean, he was going to, he was going to have drugs in the car and, and not tell me.  Or, I figured he'd probably end up telling me *** like if something happened.

AGENT 1:    Mm-hmm.  So you're saying he never told you at all?

CLIENT:    No.

AGENT 1:    And you're saying you, you didn't know?

CLIENT:    No, I didn't.

AGENT 1:    Has he been involved in drugs before?

CLIENT:    Just before.

AGENT 1:    Using?

CLIENT:    Using.

AGENT 1:    What about selling, buying, transporting, smuggling?

CLIENT:    Selling, I guess.

AGENT 1:    Selling?

CLIENT:    Selling.

AGENT 1:    What's he sell?

CLIENT:    Drugs, I guess.

12

AGENT 1:    You know what kind?

CLIENT:    ***.

AGENT 1:    Where, where's he sell it?

CLIENT:    Well, like, here, just like, I guess, it's like have a little 20 here and have like a little 30, my friends ***.

AGENT 1:    Do you know where he gets it?  Keeps it?

CLIENT:    No.  That I don't know.

AGENT 1:    Okay.  Is there any at your house right now?

CLIENT:    No.

AGENT 1:    You sure?

CLIENT:    No.

AGENT 1:    So you're saying you didn't have any suspicions?

CLIENT:    I didn't know.

AGENT 1:    I didn't ask you if you didn't know, I asked you did you have any suspicions?  I mean did you think it was odd the car wasn't there for that period?

CLIENT:    I kind of had a feeling that something . . .

AGENT 1:    You had a feeling?

CLIENT:    . . . that something was going on, but I didn't want to ask him because I didn't want him to get mad at me.

AGENT 1:    You know, we've been doing this a really long time, okay.  And you're not the first person that's sat there, okay.  You're not the first passenger in a car that had drugs in it, okay.  Um, people in the car, they know, they know what's going on.  And, and you knew what was going on.

CLIENT:    Not really cause . . .

13

AGENT 1:     Well, you, yeah, you did.  You don't want to say it right now, but you, you did.  I can tell, I mean, this story you're telling us, we've heard it 20 times before.  We get the same stories.  We went down there to visit relatives, we went to eat, somebody took the car and brought it back.  You know, variations of that, sometimes, you went and left the car with a mechanic, but they're all kind of the same stories, you know.  And it's always somebody that took it that we didn't know, or if we get a name, it's usually "Flaco" or "Gordo" or something, okay.

AGENT 2:     Don't forget *** and ***.

AGENT 1:     Huh?

AGENT 2:     Don't forget *** and ***.

AGENT 1:     And I, I can tell in your face that you know what's going on, okay.  By your posture, by the way you're just sitting there.  I mean, there's more that you know that you're not telling us.

CLIENT:     ***.

AGENT 1:     Hmm?

CLIENT:     That's all.

AGENT 1:     We'll *** the car it's, it's not like you had, you know, 10 pounds of weed.  It's, it's full of cocaine.  It's a major federal felony.  You're going to prison.  He's going to prison.  This is a big deal.  This isn't a ticket.  This isn't going to be a "oh, okay, you know what, probation."  It's not going to go like that.  This is a, this is a big deal.  You need to be honest right now, because you know who's life is in, in the balance right now?  Yours.  Your life is in the balance right now, okay.  Not his.  Don't even worry about him.  We'll, we'll take care of him.  This is about you right now.  I'm, I didn't ask any questions, I just sat back and I listened to your story.  That is the most ridiculous story.  I have heard some stupid stories in my day, but that's really bad.  And, if you think a jury is going to buy that, you think that 12 educated people are going to listen to this.  Here's this story and they're going to say, "yeah, she's telling the truth, she didn't know anything."  There's no way.  If I was a juror, I'd be mad because I'd be insulted that you'd think that I would even believe something that stupid.  What your telling, this is, is your story in a nutshell:  You went down to some relatives of his house that you don't know in Mexico for a few hours.  Then you went to go eat, but you didn't really eat, you sat in a restaurant for an hour, while he's out talking to some dude you don't know and you just sat there and you never asked a question, never said a thing, just sat there, no big deal.  He comes in, you eat, you go out, the car's not there.  Let's go for a walk.  You walk around the corner, he makes a phone call,

14

suddenly the car reappears, but you didn't want to ask him anything about it because he might get mad. You were born in Brawley, you were raised in the Imperial Valley, we live on the Mexican border, we all know drugs cross this border every day in cars. If you didn't know anything before, which I'm sure you did, but if you didn't, right there you knew, "holy shit, it's going down right now. This is what, that's what's happening." And if you said, "I didn't say anything because I didn't make him mad." Do you, who cares, who cares what he feels like. You're about to get into a car full of drugs and cross the border and commit a felony, a federal felony, and your care, you care he's mad or not. Because I tell you what if my, if I went to Mexico with my girlfriend and that shit happened, I'd be like, "what the hell is going on?" Oh, don't worry about it. Oh no, I'm going to worry about it cause I'm going to go to prison if there's something in this car. And you're damn right I'm going to worry about it. You've got a kid that you just got back, who you may not have back anymore. That may be done now, you may have just screwed yourself out of that. And if you keep lying, this is what's going to happen here, we know what happened, okay. You two guys, you and him, came across the border in a car full of cocaine. It's a fact. We know that. Now we also know, because we've done this for a long time. You can tell, I mean, I'm not 20 years old. I've been doing this for a long time. The people in the car always know about what's going. They never do the blind mule, the, they won't tell them what's, what's up then, cause that doesn't work. It, that does not work out, so they don't do that.

CLIENT:      Even if I tell the truth?

AGENT 1:    If you tell the truth, this is what happening, we know you guys know, but what we don't know is exactly what's going on, okay. So, if you lie and he lies, then we just assume you're both 100% in on it. You both are splitting the profits of what you made when you sold this cocaine. That's the only thing I can assume, unless you tell me different. Because there's only two ways this happens. Either the coke is yours and you guys are going to sell and split the money. That's one thing that's going to happen. Or, the other thing is, you guys were transporting the coke from Point A to Point B. You weren't going to sell it, you weren't going to make money off it, you didn't have anything to do with it, other than just moving the car over here and that was it and you were going to get something out of it, whatever, a couple hundred dollars.

CLIENT:      Well, he was supposed to . . . okay, when we left the car, there was nothing in there, but when the guy came, I forgot his name ***, I don't remember, I think it's on the radio, um, he came in, he was tall, skinny, um, kind of light complected, um, then he took the car and we ate and then we went for a walk. When we came back, when he got that phone call, that's when we got the car. And when he got the car, the, the keys were under the rug. And then, he's like, "okay, please be careful going in ***."

15

**16**

AGENT 1:      Okay, here's, here's what the, to show you're being honest, we typically ask three questions to gauge your honesty. If you answer these three questions honestly, we can tell you're being honest and we can give you credit for being honest because he's going to write a report. This report that he writes goes to the judge and the prosecutor, right. They decide what they're going to do to you, and the only thing they have to base their decision, really, is what, is in this report, because that's what's telling them what happened, okay. Now, in this report, it's going to kind of show, it's going to read one of two ways, it's going to show that, you're going to be able to read it and go, "oh, yeah, she's honest and cooperative." Or, if not, "she's lying," okay, because it's going to be pretty obvious. So, these are the three questions that we normally ask. What did he tell you was going to be in the car or what did you think was going to be in the car?

CLIENT:       Well, I thought it was going to be weed.

AGENT 1:      Okay.

CLIENT:       But . . .

AGENT 1:      That's, that's fine. Question Number Two: What were you going to get for bringing the car across? What were you guys going to get?

CLIENT:       Well, uh, he was going to, I don't know what he was going to get, but my baby's dad was going to only give me $500.

AGENT 1:      Okay, so he was going to give you $500. You don't know what he was getting, but he was going to give you five, okay. Now, last, last question. Where were you going to take the car to?

CLIENT:       Um, that's the thing, I just come with him, I just come with him and to Mex and to cross back and that's all and what he does with it, I don't know what he does with it.

AGENT 1:      What, what happens after you get across?

CLIENT:       Um, he drops me, he drops me off at home, and then he gets ready for tomorrow.

AGENT 1:      And he takes the car somewhere else?

CLIENT:       Uh-huh. He takes it somewhere else.

AGENT 1:      Okay, and how many times has he done this in the past?

CLIENT:       Just only two times, one or two times.

16

**17**

AGENT 1:    Okay, so twice before.

AGENT 2:    Two, two times before?

CLIENT:    Two times.

AGENT 1:    And did he actually give you the $500?

CLIENT:    Yeah.

AGENT 1:    Both times before, so you assumed that he would pay you this time also?  Okay.

CLIENT:    And, um, cause I figured he tell me not to worry.  That he was going to have my back, so . . .

AGENT 1:    Yeah, but the thing is he cannot get your back because he can't come up to us and say, "hey, leave her alone," you know, because we're not going to.  We're going to take you to jail.  We don't have a choice in that because you guys were both in a car full of cocaine.  You know, you guys are both going to jail, and that's that regardless of what either one of you says.  The, the thing that we can do now is to try and sort out what happened and say, "like, okay, this is his deal and you're kind of along for the ride," and, if that's the case, then that's what we want to know because that's what we want to show.

CLIENT:    Well, I mean, I just come with him to the ride to Mex, and then he drops me off.  And from there, I don't know what he does with that.

AGENT 1:    Okay.  And every time you've gone, you always dealt with the same dude?

CLIENT:    Mm, yeah, with the same one.

AGENT 1:    And that's the dude that he was talking to with the ***?

CLIENT:    Yeah.

AGENT 2:    Do you usually go to the same restaurant?

CLIENT:    Mm, no.

AGENT 1:    Okay.

AGENT 2:    Did you actually go to a restaurant today?

17

CLIENT:     Yeah.

AGENT 1:    So, you, I mean, you knew what was going on?  You there was . . .

CLIENT:     I, yeah, uh, I did.

AGENT 1:    Well, what did you know?

CLIENT:     I knew that he was going to go pick up some drugs, and then he was going to give me $500, and he'd just tell me just sit tight and not to worry.  Don't ask any questions.

AGENT 1:    How'd you, how'd you know he was going to go pick up drugs?

CLIENT:     Mm, from the sound of his tone, voice.  I know that the sound of his tone, voice, the way he sounds.

AGENT 2:    Rodrigo?

CLIENT:     Yeah, when he talks.

AGENT 1:    Does he have another car, other than this one?

CLIENT:     Mm, he has a van, but it's wrecked.

AGENT 2:    Oh.

AGENT 1:    Did, did Rodrigo actually ever tell you, "We're, we're transporting drugs"?

CLIENT:     Uh, no.  Nev-, what do you mean?

AGENT 1:    Did he ever, what did he say to you as far as, how, you know, what's going?  You said you thought there was weed, why did you think it was weed, because that's what he told you, or . . .

CLIENT:     Because that's what he told me, it was weed, but he didn't tell me it was coke.

AGENT 1:    So, on the pre-, pre-, previous times, Rodrigo told you there was, there was marijuana, weed in the car?

CLIENT:     That there was marijuana in the car.

AGENT 1:    He told you that?

18

CLIENT:      Well, he told me he don't know exactly where it's at in the car, cause I told him where I, where is it exactly at, he says, like, he doesn't really know.  They just, they just take the car, and put it in the car.

AGENT 1:     Okay.

CLIENT:      That's all.

AGENT 1:     So what did he tell, so you knew today you were bringing drugs back?

CLIENT:      Mm-hmm.

AGENT 1:     Okay, there was no, there was no doubt you knew there was drugs in the car?

CLIENT:      Mm-hmm.

AGENT 1:     Okay, and you know, know that's illegal?  Once again, is there anything else that you know that you haven't told us?

CLIENT:      No.

AGENT 1:     We want to get you as much credit for being honest as possible.

CLIENT:      That's about it.

AGENT 1:     Okay.  Do you know any other, any other people who are involved, any locations, any of their cars?  Okay, cause here's the thing, anything that you tell us, that helps us out, we have to tell the prosecutor about it, and to say, "hey, she told us that there was another car, and we were able to locate that car," um, and you get credit for that.  And that credit is that they try to figure you out what they're going to give you for, you know, this, that is put into your favor and the lawyers work it out.  They say, she gave us this.  She gave your guys this, and you know I think you should, she should get this, blah, blah, and the lawyers handle all that.  So, is there anything like that that you know about?  Something that we, that we could, could help us also?

CLIENT:      No, it was just, no, last time he was just walking.  It wasn't in the car.

AGENT 1:     Okay, but you don't know about any of the people who were crossing drugs in, the cars they were using?

CLIENT:      No.

AGENT 1:     Anything like that?

19

CLIENT:     No.

AGENT 1:     Any other names, any names of any people involved?  Nicknames?

CLIENT:     I forgot his name.  It's on, it's on one of the phones.

AGENT 1:     Okay.

CLIENT:     He was trying to call today.  Usually, when we get across, we call him and let him know that we're already across.

AGENT 1:     Uh-huh.

CLIENT:     But this time we didn't get across, so . . .

AGENT 1:     You didn't call, okay.  Okay.  Any other questions?

AGENT 2:     I'm good.

CLIENT:     ***.

AGENT 1:     Okay, what we're going, this is what, what's going to happen, um, we're going to fingerprint you right now, um, and we'll put you back over there.  We're going to talk to Rodrigo.  Hopefully, he's going to be honest for his own sake, um, we'll see.  And, um, after the, after we're done with all that, which shouldn't take all that long, you guys are going to go to ICJ, Imperial County Jail.  Have you been there before?  Do you know where it's at?

CLIENT:     Mm, just only one time.

AGENT 1:     Okay, we're going, we're going to put in there.  You guys have a court appearance tomorrow morning at the Federal Courthouse on *** and ***.  And then once, you guys will have an appearance there before the judge.  The judge will set bail for you and do all that stuff and, um, you know, if you guys make bail, great.  You know, ***.  And then they'll start, um, you'll get a lawyer assigned to you tomorrow, and then they'll, they'll do all that stuff, and eventually they'll give you, make you some kind of a plea offer, or whatever.

CLIENT:     Are you guys going to kind of tell my social worker?  Because I have a social worker.

AGENT 1:     Um, no, we don't generally reveal information.  I mean, the fact that you were arrested for being in a car full of cocaine is common knowledge, it's, uh, public knowledge.  It's not secret.  But as far as like what you tell us and stuff in here, no,

we don't reveal that to social workers and stuff.  So your social worker will know that you were arrested in a car with drugs, but as far as, you know, the rest of it, that's between us.

I'm just going to read back to you what you said and just to make sure it's accurate. Okay, um, Rodrigo picked you up at your house today about 12 o'clock.  You went down to Mexicali.  You went to visit some of his relatives, who you don't really know, okay.  And from there you went to, uh, Marisco's to go eat and, uh, some guy you don't know, a tall, skinny, light-skinned came and Rodrigo talked to him for about an hour, okay.  Um, and he took the car, you guys ate, um, went out for a walk after you ate.  Rodrigo got a call on his phone, um, you didn't really listen to the conversation, at all?

CLIENT:       Nuh-huh.

AGENT 1:      Okay, but something the car was ready and you went back to the car.

CLIENT:       Yes.

AGENT 1:      And the keys were under the floor mat?  Okay.  And you got back in and you drove back, okay.  Um, and you, you knew there were drugs in the car, okay.  And Rodrigo said you were going to get $500 and you've been with him two times before, right? And *** paid you in the past $500 for being with him, okay.  That's, that's accurate? I don't want to put any words in your mouth, I just want to make sure it's true, okay, and you're okay with what's going to go in the report, right?  Can I just ask you just to, just sign your name right there.  ***  What time you got?

AGENT 2:      22, uh, 14.

AGENT 1:      And can you sign right here and right here, um, that's for your fingerprints.

AGENT 2:      The time is 22:14, and this interview is concluded.

(*** = Inaudible)

21

**22**

# EXHIBIT B

**ERICA K. ZUNKEL**
California State Bar No. 229285
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California  92101-5030
Telephone:  (619) 234-8467
e-mail:  erica_zunkel@fd.org

Attorneys for Ms. Ruiz-Montenegro

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE M. JAMES LORENZ)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 08cr1073-L |
| Plaintiff, | ) | DATE:  May 27, 2008 |
| | ) | TIME:  2:00 p.m. |
| v. | ) | |
| MONIQUE RUIZ-MONTENEGRO | ) | DECLARATION IN SUPPORT |
| | ) | OF DEFENDANT'S MOTION TO |
| Defendant. | ) | SUPPRESS STATEMENTS |
| | ) | |

TO:     KAREN P. HEWITT, UNITED STATES ATTORNEY; AND
        STEWART YOUNG, ASSISTANT UNITED STATES ATTORNEY

        COMES NOW, the defendant, Monique Ruiz-Montenegro, by and through her attorneys, Erica K.

Zunkel, and Federal Defenders of San Diego, Inc., and hereby files this Declaration in Support of Defendant's

Motion to Suppress Statements.

                                        Respectfully Submitted,

DATED:     May 12, 2008                 _____
                                        **ERICA K. ZUNKEL**
                                        Federal Defenders of San Diego, Inc.
                                        Attorneys for Ms. Ruiz-Montenegro

24

**ERICA K. ZUNKEL**
California State Bar No. 229285
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467

Attorneys for Ms. Ruiz-Montenegro

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE M. JAMES LORENZ)**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 08cr1073-L |
| Plaintiff, | ) Date:  May 27, 2008 |
| | ) Time:  2:00 p.m. |
| v. | ) |
| | ) <u>DECLARATION OF MS. RUIZ-MONTENEGRO</u> |
| MONIQUE RUIZ-MONTENEGRO, | ) |
| Defendant. | ) |

I, MONIQUE RUIZ-MONTENEGRO, declare under penalty of perjury:

1.    I am the defendant in the above-captioned case and make this declaration in support of a motion filed by my attorney.

2.    On February 2, 2008, I was arrested by United States agents at the Calexico, California West Port of Entry.

3.    I was the passenger of a car driven by Rodrigo Velasquez-Cota.

4.    After my arrest, agents read me my rights. I did not understand my rights.

5.    Early on in the interrogation, agents asked me how I knew the driver of the car.

6.    I told them he is the father of my son, Jose.

7.    About halfway through the interrogation, the agents repeatedly told me I was lying to them and that what I was telling them was ridiculous.

25

8.    The agents told me I was going to go to prison.

9.    The agents told me that I was going to lose custody of my child.

10.    During the interrogation, I felt harassed and pressured to speak to agents.

11.    I felt pressured by agents because of the manner in which they talked to me and, in particular, the fear I had concerning not seeing my son and losing custody of him.

My attorney drafted this declaration on my behalf.  I have read it and I adopt it as my own.  I swear that, to the best of my knowledge and memory, the foregoing is true and correct.

Dated: **5·12·08**

MONIQUE RUIZ-MONTENEGRO,
Declarant

26